IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| S.T., b/n/f SARAH J., | § | NO. 1:24-CV-780-DAE |
| | § | |
| Plaintiff/Counter-Defendant, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| AUSTIN INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant/Counter-Plaintiff. | § | |
| _____ | § | |

## ORDER

The matters before the Court are: (1) Defendant/Counter-Plaintiff

Austin Independent School District's ("AISD" or the "District" or "Defendant")

Motion for Summary Judgment (Dkt. # 18); and (2) Plaintiff/Counter-Defendant

S.T. by next friend, Sarah J.'s ("S.T." or "Plaintiff") Motion for Summary

Judgment (Dkt. # 22).  The Court finds this matter appropriate for resolution

without a hearing.  After careful consideration of the motions, briefing, and the

administrative record in this case, the Court finds that the District's motion for

summary judgment is **GRANTED IN PART AND DENIED IN PART**, and

Plaintiff's motion for summary judgment is **GRANTED IN PART AND**

**DENIED IN PART.**

FACTUAL BACKGROUND

This case involves Plaintiff S.T., a student with Chronic Fatigue Syndrome[1] ("CFS") and dysgraphia.[2]  (Dkt. # 1 at 2); (A.R. 9.)[3]  At the time of the relevant matters in this case, S.T. was a high school student at Austin Independent School District, the school responsible for providing him with a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.

When S.T. was in fifth grade, he was diagnosed with a mononucleosis-like illness.  (A.R. 2150.)  Although he missed school at the time, he recovered.  (Id.)  S.T. ultimately became sick again in seventh grade and was diagnosed with mono once more, once again recovering.  (Id.)  However, early in

---

[1] As described in the record, CFS, also known as myalgic encephalomyelitis, is inflammation of the myelination of the brain.  (A.R. 2238–39.)  Because of his Chronic Fatigue Syndrome ("CFS"), S.T. slept for 18–20 hours per day and fatigues easily. (A.R. 1904, 2112.)  S.T. had typical symptoms for CFS, including exhaustion after minimal exertive or cognitive tasks and unrefreshed sleep.  (A.R. 2234.)  This condition inhibited S.T.'s ability to remain awake for most of the day, limiting his working hours and the time he was able to spend in instructional periods before he needed to rest.  (A.R. 1897, 2120.)

[2] Dysgraphia is a neurodevelopmental disorder that causes deficits in graphomotor function and/or storing and retrieving orthographic codes, resulting in impacts to handwriting and/or illegible or inefficient letter formation.  (A.R. 7.)  Dysgraphia can also cause issues with spelling or difficulties with written expression.  (Id.)  The Court focuses primarily on S.T.'s CFS diagnosis since the SEHO found that S.T.'s dysgraphia did not qualify him as eligible under the IDEA, and Plaintiff does not appear to contest that decision.  (See Dkt. # 22.)

[3] Citations to "A.R." are to the official administrative record as provided by the Parties and maintained by the Texas Education Agency ("TEA").

his ninth-grade year, he once more fell ill.  (Id.)  The events relevant to this case took place beginning in S.T.'s freshman year of high school as described below.

A.    2021–2022 School Year

The administrative record in this case indicates that in late September of 2021, S.T. became ill, and on September 29, 2021, his parent, Sarah J., informed AISD that he had been diagnosed with mononucleosis.  (A.R. 1113, 1116.)  After his diagnosis, AISD initiated procedures to provide general education homebound services by October 4, 2021.  (A.R. 1116–20.)  S.T. was then placed on a waitlist for a homebound instructor but spent approximately four months waiting for an instructor.[4]  (A.R. 1936–37, 1950–51.)  S.T. was diagnosed with CFS on October 26, 2021, and the District was notified of this diagnosis on October 28, 2021.  (A.R. 1205.)  S.T. received his first day of homebound services on February 9, 2022.  (A.R. 1270.)  AISD provided S.T. with homebound instruction for the remainder of the school year.  (A.R. 1455–58.)

After missing four months of instruction in this school year, S.T. had fallen behind in his coursework and received incomplete grades in several classes. (A.R. 1900, 2055, 2113.)  He received the opportunity to make up work late or to have exams count as his grade for the semester and consequently was able to pass

---

[4] AISD contends that this waiting time was atypical and attributes it to "staffing shortages exacerbated by the COVID-19 pandemic and a surge in student need." (Dkt. # 18 at 3.)

several of his classes in the fall and spring semesters.  (A.R. 2113, 2153.)  However, when he did begin homebound education in the spring semester, he first worked to make up the missing work from fall semester and remained several months behind on coursework.  (A.R. 2157, 2169.)  S.T.'s attendance also suffered significantly when he fell ill, with the IEE reporting 39 unexcused absences and 15 homebound absences out of 108 days of enrollment.  (A.R. 605.)

On March 9, 2022, Sarah J. formally requested that AISD conduct an evaluation on S.T. for special education services.  (A.R. 1186.)  However, no action was taken by the District to obtain Sarah J.'s consent during the remainder of the 2021–2022 school year.  (Dkt. # 18 at 7) (acknowledging this delay was unexplained by AISD).

B.    2022–2023 School Year

At the beginning of his sophomore year, S.T. only attended three days in the first two weeks before he became too ill to attend school in-person.  (A.R. 1283.)

AISD issued its Notice of Full and Individual Evaluation ("FIIE") on August 4, 2022, received parental consent on August 7, 2022, and completed the FIIE on September 26, 2022.  (A.R. 562–68.)  The FIIE consisted of assessment tools and strategies related to S.T.'s suspected disability.  (A.R. 572–88.)  The FIIE recommended that S.T. continue to be provided with Section 504 accommodations,

including extra time, reduced assignments, and breaks as needed.  (Id.)  The FIIE also concluded that assistive technology services or devices were unnecessary to provide a free and appropriate public education for S.T.  (A.R. 588.)

An Admission, Review, and Dismissal ("ARD") Committee ("the Committee") meeting[5] was held on October 17, 2022 to review the results of S.T.'s FIIE.  (A.R. 589–94); (see also PEX 19.)  At this meeting, Sarah J., accompanied by a parent advocate, voiced concerns with the findings of the FIIE.  (PEX 19.)  Ultimately, the Committee adopted the conclusions of the FIIE despite Sarah J.'s disagreement.  (A.R. 589–94.)  Sarah J. then requested an Independent Educational Evaluation ("IEE"), which AISD approved.  (A.R. 601–25.)  Following the meeting, AISD resumed homebound services.  (A.R. 517–26.)

Sarah J. submitted a Chronic Illness Physician's Form to AISD on November 2, 2022, detailing S.T.'s medical needs for his CFS.  (A.R. 515.)  Among these needs were shortened school days, frequent rest breaks, access to the nurse's office, and the ability to go home if symptoms worsened.  (Id.)  On December 14, 2022, an additional Physician Information Report was submitted

---

[5] An ARD meeting is a meeting of the group of qualified professionals, along with the parent, who determine whether the child is a child with a disability as defined in 34 C.F.R. § 300.8.  See 34 C.F.R. § 300.306(a)(1); 19 Tex. Admin. Code § 89.1050(a).

anticipating that S.T. would be confined to his home for a period of six months. (A.R. 516.)

Plaintiff's IEE was completed by Laura Frame on April 14, 2023. (A.R. 601–625.)  The IEE recommended that S.T. met the IDEA's eligibility condition for Other Health Impairment ("OHI") and specific learning disability resulting from his dysgraphia.  (A.R. 601–625.)  AISD held another ARD Committee on May 12, 2023, to review the findings of the IEE.  (A.R. 626–33); see also PEX 20.  However, the Committee ultimately decided that the instructional recommendations could be implemented through existing Section 504 accommodations and general education homebound services, rather than by implementing an Individualized Education Program ("IEP") through the IDEA. (Id.) Accordingly, AISD continued providing homebound services to S.T. for the remainder of the 2022–2023 school year.[6]  (A.R. 628–29.)

PROCEDURAL BACKGROUND

On June 6, 2022, Sarah J. filed a request for a due process hearing under the IDEA with the Texas Education Agency.  (A.R. 3.)  The due process hearing was held across two and a half days from March 5–7, 2024.  (A.R. 2.)

---

[6] AISD renewed homebound services and continued them throughout the 2023–2024 school year until the due process hearing.

Plaintiff raised nineteen legal issues, seeking ten distinct items of relief.[7] (A.R. 5–8.) The SEHO issued a decision on April 18, 2024, ultimately concluding that S.T. was eligible under the IDEA due to his CFS, but not because of his dysgraphia. (A.R. 1–30.)

Plaintiff S.T. brought this action in federal court on July 12, 2024, seeking attorneys' fees and expenses under the IDEA as a prevailing party. (Dkt. # 1.) The District filed its Motion for Summary Judgment on July 21, 2025, and Plaintiff filed its Motion for Summary Judgment on July 30, 2025. (Dkt. ## 18, 22.) Both parties timely responded and replied to the other's motions.

## LEGAL STANDARD

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–482. The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A).

States receiving federal assistance under the IDEA must: (1) provide a

---

[7] Nine items of relief were named, plus an additional item for "such other and further relief the Hearing Officer deems just and proper." (A.R. 6.)

"free appropriate public education" ("FAPE") to each disabled child within its boundaries, and (2) ensure that such education is in the "least restrictive environment" ("LRE") possible.  Cypress–Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 247 (5th Cir. 1997); 20 U.S.C. § 1412(a)(1), (5). The FAPE provided must be developed to each disabled child's needs through an "individual education program" ("IEP").  Michael F., 118 F.3d at 247; see 20 U.S.C. § 1414(d).  In Texas, the committee responsible for preparing an IEP is known as an Admissions, Review, and Dismissal ("ARD") committee.  Michael F., 118 F.3d at 247.

The role of the judiciary under the IDEA is limited, leaving the choice of educational policies and methods in the hands of state and local school officials. White v. Ascension Parish Sch. Bd., 343 F.3d 373, 377 (5th Cir. 2003) (citing Flour Bluff Indep. Sch. Dist. v. Katherine M., 91 F.3d 689, 693 (5th Cir. 1996)). "Under the IDEA, a federal district court's review of a state hearing officer's decision is 'virtually de novo.'"  Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 808 (5th Cir. 2003).  "The district court must receive the state administrative record and must receive additional evidence at the request of either party."  Id. The court must reach an independent decision based on a preponderance of the evidence.  Hous. Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 347 (5th Cir. 2000); Michael F., 118 F.3d at 252.  However, this requirement "is by no means an

invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206 (1982). Instead, "due weight" is to be given to the hearing officer's decision. Id. Thus,

> courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to the state and local educational agencies in cooperation with the parents or guardians of the child.

Id. at 207.

The party seeking relief under the IDEA bears the burden of proof. Schaffer v. Weast, 546 U.S. 49, 62 (2005). Specifically, "a party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." Michael F., 118 F.3d at 252.

## ANALYSIS

Both parties have filed summary judgment motions in this case. AISD's motion first challenges the SEHO's findings that S.T. was eligible for special education and related services under the IDEA as a student with Other Health Impairment ("OHI"), and that AISD violated its Child Find obligation. (Dkt. # 18 at 5.) The District's motion then challenges whether Defendant is a

prevailing party and entitled to attorney's fees.  (Id.)  In a cross motion, S.T.

requests the Court determine whether S.T., as the prevailing party at the

administrative hearing, is entitled to reimbursement of attorney fees.  (Dkt. # 22.)

The motions are addressed below.[8]

## I.    Austin Independent School District's Motion for Summary Judgment

AISD argues that the SEHO erred in his determination that

the District violated the IDEA because the SEHO incorrectly concluded that S.T.

was eligible for special education services.  (Dkt. # 18 at 13–14.)  AISD takes issue

with the SEHO's findings that AISD violated its Child Find obligations, that it did

not comply with the IDEA, and that S.T. was eligible for and needed special

education services.  (Dkt. # 18.)  Because several of AISD's arguments turn on the

underlying question of whether the SEHO erred in finding S.T. eligible under

IDEA because of his Chronic Fatigue Syndrome ("CFS"), the Court begins with

that analysis before looking to the remaining questions.

### A. IDEA Eligibility

Eligibility for IDEA benefits depends on whether a child is a "child

with a disability" within the meaning of 20 U.S.C. § 1401(3)(A).  To meet this

---

[8] The parties similarly address overlapping issues in S.T.'s Motion for Summary Judgment (Dkt. # 22), AISD's Response to that Motion (Dkt. # 24), and S.T.'s Reply (Dkt. # 27).  Accordingly, the Court additionally considers arguments made in both parties' motions in deciding the issues related to the underlying SEHO decision.

definition, a child must satisfy two prongs: he or she must (1) have a qualifying disability, and (2) "by reason thereof, need[] special education and related services."  20 U.S.C. § 1401(3)(A).  Neither party appears to dispute that the SEHO was correct in finding that S.T.'s CFS was a qualifying disability as an "other health impairment."[9]  See AR 16.  However, the parties disputed before the SEHO—and still dispute before this Court—whether S.T. *needed* special education and related services as a result of his disability.  Id.; (see Dkt. # 18 at 10).  "Thus, the central dispute pertains to the second prong: *by reason of* his [CFS], does S.T. *need* special education and related services?"  Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F., 503 F.3d 378, 382 (5th Cir. 2007) (emphases in original).

"Neither the IDEA nor federal regulations define what it means to 'need' special education and related services."  Lisa M. v. Leander Ind. Sch. Dist., 924 F.3d 205, 216 (5th Cir. 2019).  Alvin Ind. Sch. Dist. v. A.D. ex rel. Patricia F. provided guidance on the issue, urging courts to consider the "unique facts and circumstances" of each case, including "aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's

---

[9] The qualifying disabilities listed in 20 U.S.C. § 1401(3)(A)(i) include: "[I]ntellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities[.]"  20 U.S.C. § 1401(3)(A)(i).

physical condition, social or cultural background, and adaptive behavior" instead of focusing exclusively on "passing grades and [test] scores." 503 F.3d at 383 (quoting 34 C.F.R. § 300.306(c)(1)(i)).

Moreover, the IDEA was enacted to guarantee a "basic floor of opportunity." Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 200 (1982). Thus, "need" should not be measured "according to whether or not [a student's] potential could be maximized via special education services." Alvin Ind. Sch. Dist. v. A.D. ex rel. Patricia F., 503 F.3d at 384 n.9.

Special education is defined under IDEA as "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including (i) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (ii) instruction in physical education." 34 C.F.R. § 300.39(a)(1). "Specially designed instruction" is further defined to mean "adapting, as appropriate, to the needs of an eligible child under this part, the content, methodology, or delivery of instruction (i) to address the unique needs of the child that result from the child's disability; and (ii) to ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. § 300.39(b)(3).

12

Although the District argues that this definition should not be applied to the provisions regarding eligibility under the IDEA, the Court finds these arguments unpersuasive.  (Dkt. # 25 at 5.)  AISD relies on Spring Branch Indep. Sch. Dist. v. O.W. by Hannah W., 961 F.3d 781, 791 (5th Cir. 2020), to argue that because 34 C.F.R § 300.39 and 34 C.F.R. § 300.306 (concerning eligibility) do not cross-reference one another, the provisions should be read independently and the Court should discern legislative intent to define special education and specially designed instruction within the context of IDEA eligibility.  (See Dkt. # 25 at 5.) However, this case is unlike O.W. by Hannah W., where the Panel discussed interpreting the child find and expedited evaluation statutory provisions of the IDEA separately after undertaking a thorough review of the IDEA's text and structure.  Id. at 791–92.  Here, the definition provision at issue is one located not in a separate, unrelated section, but instead in the broadly applicable definitions section of the statute.  See 34 C.F.R. § 300.39 (contained in section defining nearly forty other terms contained in the IDEA).  Further, the eligibility determination regulations in 34 C.F.R. § 300.306 reference the definition of a "child with a disability" in § 300.8, found in the same subpart as § 300.39.  The Court is thus unpersuaded that this definition of special education found in § 300.39 would not apply to the remainder of the IDEA, and in particular, to the eligibility determination procedures found in subpart D.

The SEHO found that the District had provided special education services within the meaning of IDEA because it adapted the delivery of S.T.'s education in limiting the time per day and week for instruction. (Dkt. # 1-1 at 19.) The SEHO made the following findings:

> Regarding Student's chronic fatigue syndrome, Student sleeps for most of the day and tires quickly. Because of this, he is unable to attend school full time. To address Student's unique needs resulting from his chronic fatigue syndrome so that Student can access the general education curriculum, District has adapted the delivery of Student's education by significantly limiting the amount of time per day and per week Student receives instruction. District also changes how the material is delivered to Student to accommodate the shorter instructional time. Because of these adaptations to the delivery of instruction, District is providing specially designed instruction which meets the definition of special education.

(AR 18.) Finding these accommodations met the definition of special education, the SEHO concluded that S.T. must, therefore, "need" special education services and be eligible for IDEA. Id. at 19–20.

The District now argues this finding was in error and that the SEHO only cursorily determined S.T.'s eligibility under IDEA without specifically finding a "need" for special education beyond pointing to the Section 504 accommodations he was receiving. (Dkt. # 18 at 13.) AISD says this amounts to "collaps[ing] the IDEA's two-prong eligibility standard and erod[ing] the role of Texas' general education homebound program to always amount to special education programming, even when the student does not 'need' an IEP." (Id.) S.T. responds that there is sufficient evidence to support the conclusion that the

14

504 accommodations provided by AISD were, in fact, specialized instruction and demonstrated S.T.'s need for special education.  (Dkt. # 23 at 3–5.)

Although the Court affords the SEHO's decision "due weight" under Rowley, 458 U.S. at 206, the Fifth Circuit has found the proper standard of review for a district court under these circumstances is "virtually de novo."  Teague Indep. Sch. Dist. v. Todd L., 999 F.2d 127, 131 (5th Cir. 1993).  "The district court is required to accord due weight to the hearing officer's findings, but it must ultimately reach an independent decision based on the preponderance of the evidence."  Seth B. ex rel. Donald B. v. Orleans Parish Sch. Bd., 810 F.3d 961, 966 (5th Cir. 2016).  Here, the Court has undertaken a thorough review of the complete underlying administrative record, including both parties' exhibits, transcripts, audio recordings of various hearings, and other information and materials provided to the Court.  After reviewing these materials, the Court reaches the conclusion that the SEHO's decision should be afforded due weight and affirmed in its finding that S.T. was eligible as a child with a disability under the IDEA.[10]

---

[10] Indeed, the Court acknowledges that it need not afford due weight deference to the SEHO decision if it concludes it made its decision using legal or factual errors, the Court nonetheless concurs with the findings of the SEHO after a careful review of the lengthy administrative record.  See Teague Indep. Sch. Dist. v. Todd L., 999 F.2d at 131 ("[T]he statute does not state that the district court must defer to [the hearing officer's] findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts.").  The decision is instead based on a "virtually de novo review" of over two-

Although the inquiry regarding the appropriateness of an IEP looks at events over a longer period of time, the eligibility of a student under the IDEA "is a snapshot of the student's condition at the time of the eligibility determination.  At the eligibility determination moment, therefore, incorporating events that occur afterwards would be incongruous and, indeed, can only invite Monday morning quarterbacking."  Lisa M., 924 F.3d at 215.  Here, the school determined twice that S.T. was ineligible for special education under the IDEA: once following his FIIE on October 17, 2022, and once following the results of the IEE on May 12, 2023.[11]  Both times, the ARD Committee decided that S.T.'s educational needs could be accommodated by utilizing or modifying the Section 504 accommodations already in place.[12]  Accordingly, the Court views the facts concerning eligibility as of the ARD Committee dates, incorporating facts that occurred throughout the 2021–2022 and 2022–2023 school years.

---

thousand pages of the administrative record and several hours of audio recordings from various meetings and hearings.

[11] The above dates are the dates the ARD committees met to adopt the recommendations of each report—not the dates the reports were actually completed.  The record indicates that the FIIE was completed on September 26, 2022, and that the IEE was completed on April 14, 2023.  The Court views the ARD Committee meeting dates as the "eligibility determination moment" for the purposes of this analysis."  Lisa M., 924 F.3d at 215.

[12] In both meetings, Sarah J. expressed her concerns that the Section 504 accommodations were not enough, that S.T. had been falling behind, and that he needed special education to give him additional flexibility in his course schedule due to his CFS.  (See PEX 19; PEX 20.)

The relevant question under the second prong of an eligibility determination under the IDEA is whether a student "needs special education and related services." 20 U.S.C. § 1401(3)(A). AISD argues that it was improper for the SEHO to look at S.T.'s Section 504 accommodations and count those toward his educational needs when they were merely accommodations or adjustments he was receiving at the time of the eligibility determination. For this proposition, they cite language from a Fourth Circuit case, Miller v. Charlotte-Mecklenburg Sch. Bd. of Educ., 64 F.4th 569 (4th Cir. 2023), which states that "a student does not 'need' [special education and related services] if the student is already getting what would qualify as a free appropriate public education *without* them." Id. at 575 (emphasis in original). However, the Court does not find the reasoning in Miller persuasive where no authority was cited for the above-quoted sentence. Id. Further, the section in which the quote was discussed continued to rely primarily on the language of the statute itself and the deference owed to the hearing officer—a situation that does not apply to AISD's arguments here, which urge the Court to discredit the findings of the SEHO.

Instead, the Court finds it appropriate to consider the accommodations that S.T. received—not to accept the fact that he received them at all as *per se* evidence of a need for special education, but rather to determine whether any of the accommodations *were* special education such that they indicated the District's

17

treatment of S.T. as a student who "needed" specialized instruction.  Additionally, the Court does not view the 504 accommodations as dispositive but rather considers the full record in deciding to concur with the SEHO.

The District adapted the delivery of instruction to the specific needs of S.T.  See 34 C.F.R. § 300.39(b)(3) (defining "specially designed instruction" as "adapting, as appropriate, to the needs of an eligible child under this part, the content, methodology, or delivery of instruction (i) to address the unique needs of the child that result from the child's disability. . .").  As of the eligibility determination dates, S.T.'s CFS had worsened to the point where he was sleeping around eighteen hours per day.  (A.R. 2112.)  He tired easily during instructional periods, and he could only tolerate short instructional blocks of an hour and a half at a time before needing to rest.  (A.R. 1904.)  Unlike other students in the general education homebound program, who were scheduled in two-hour instructional blocks during times that were based on convenience of location, S.T.'s instructional periods had to be scheduled around when he was awake and were shortened because of his specific health needs resulting from his CFS.  (A.R. 1911–1913.)  His homebound teacher communicated with S.T.'s mother to ensure that S.T. was being instructed when he was at his optimal state based on his health condition.  (See A.R. 1509 (indicating Sarah J. would prefer a different time of day for instruction because S.T. "won't be at his best at [the proposed] times").)

18

The District raises the valid concern that there is a distinction between the general education homebound program and special education services; to be sure, the Court does not intend to suggest that every student receiving homebound education services needs or is receiving special education.  Surely the opposite cannot be true either—using the fact a student is not receiving certain accommodations as evidence of a lack of a need for special education would similarly produce troubling results.  However, under these circumstances and given the unique facts of this case and S.T.'s condition, it is clear that the District treated S.T. as if he needed special education by tailoring the method of instruction not only to be homebound, but also to match the specific days and hours that fit his physical condition.  (See A.R. 1516 (showing that homebound teacher adjusted day and hour instructional blocks based on parent feedback that S.T. was "doing well" with schedule).)  This appears to surpass the purview of the general education homebound program and suggest, instead, that S.T. was being treated as a student who needed special education, even if the District maintained that he did not in its ARD Committee meetings.

The Court balances this against other considerations in the record, including input from S.T.'s teachers, his parent, Sarah J., his physicians, and S.T.'s

19

academic performance.[13]  As of the eligibility determination dates, S.T. had not taken any state or district assessments by which to judge his academic progress, including State of Texas Assessment of Academic Readiness (STAAR) tests. (A.R. 605.)  However, the IEE noted that S.T.'s grades suffered due to his health condition, and that in his 9th grade year, he failed two electives in his first semester: American Sign Language (38 average), and Multimedia & Design (50 average). (A.R. 604.)  His other grades were passing and ranged from Bs in Principles of Health Sciences (81), Advanced World Geography (82), and Advanced English I (83) to As in Cross Country (100), Advanced Biology (92), and Advanced Geometry (90).  (Id.)  In Spring of 2022, S.T. passed four classes: Cross Country (100), Advanced Biology (93), Advanced World Geography (96), and Advanced English I (95).  (Id.)  He failed American Sign Language (0), Principles of Health Science (54), and Advanced Geometry (44).  (Id.)  In fall of 2022, S.T. passed three classes: World History Studies (92), Algebra 2 (76), and Health Science Theory (80), and he failed Advanced Chemistry (52) and English 2 (68).  (Id.)  The

---

[13] The Court also considers the full audio recordings of the ARD Committee meetings at which the Committee determined whether S.T. was eligible under the IDEA and notes that there appeared to be confusion among committee members on the difference between Section 504 and the IDEA.  During the committee meeting discussing the results of the IEE, one District member expressed that she did not fully understand the difference between 504 and special education, and that since she was not an expert, she would defer to the experts for that determination.  (PEX 20 at 1:31:50.)

Court also considers testimony that S.T.'s final grades in fact overstate his academic success during this period because he was permitted to make up work after the semester was over.  (A.R. 1899–1900, 2056.)

S.T.'s physicians, although they had a limited scope of knowledge on his education, were able to testify to his medical needs, and suggested that he needed a mix of social interaction at school and homebound instruction.  One doctor testified that "kids are social creatures.  They do need interaction with their peers, for better or worse.  The kids who are confined to home are getting a teacher.  I don't know how often; you would have to tell me.  They're not getting that social interaction."  (A.R. 2238.)  According to the testimony of Sarah J., S.T.'s CFS may fluctuate in its severity and although it would be ideal for him to transition back into the classroom, it could be a slow, arduous process that could be possible, but over a prolonged period of time.  (A.R. 2184.)  Sarah J. described the delicate process by which S.T. has regained strength, but emphasized that if he pushes too hard, progress can be lost, and it is important to "slowly rebuild his body" to avoid overstressing him—something that cannot be accomplished using the standard three-week long transition period to in-person classes.  (A.R. 2185.)  The general education homebound program is accessible for students with chronic illness but does not permit the flexibility for students to alternate between homebound and in-person education—in other words, to attend on an intermittent

21

schedule.[14]  Thus, as applied to S.T., a student with CFS who may require additional flexibility in whether to utilize homebound services or attend school on campus due to his qualifying disability and unique medical and educational needs, the general education homebound program is not designed in such a way that meets those needs.

The Court thus denies the District's motion for summary judgment and grants the Plaintiff's motion on the issue of S.T.'s eligibility as a child with a disability under the IDEA.

B. Child Find Obligations

IDEA mandates that public school districts must "identify, locate, and evaluate all children with disabilities residing in the State to ensure that they receive needed special-education services." Forest Grove Sch. Dist. V. T.A., 557 U.S. 230, 245 (2009) (quoting 20 U.S.C. § 1412(a)(3)(A)) (internal alterations omitted).  This is referred to as IDEA's "Child Find" mandate, and it is triggered when the school has reason to suspect that a student has a disability coupled with

---

[14] The Court notes that the record on this point is mixed, with Ms. Walls, the Assistant Principal at Bowie High School, testifying that students are permitted to have an intermittent homebound schedule within the general education homebound program, (A.R. 2077), while there are statements in the record from other District representatives that reflect an insistence that the official policy prevents students from intermittent placement on general education homebound services outside of the transition period and expressing that AISD cannot serve S.T. through the homebound program on an intermittent basis.  (A.R. 549 ("We cannot continue to serve intermittently.").)

reason to suspect that special education services may be needed to address that disability.  El Paso Indep. Sch. Dist. v. Richard R., 567 F. Supp. 2d 918, 950 (W.D. Tex. 2008).  This obligation requires schools to identify children in need of such services "within a reasonable time after the School District is on notice of facts or behavior likely to indicate a disability."  Dallas Indep. Sch. Dist. v. Woody, 865 F.3d 303, 320 (5th Cir. 2017).  Accordingly, a court's inquiry into whether a school district complied with its Child Find obligations proceeds in two stages: first, looking to whether the school district had reason to suspect the student may have had a disability; if so, courts next determine whether the school district evaluated the student within a reasonable amount of time.  El Paso Indep. Sch. Dist. v. Richard R., 567 F. Supp. 2d at 950.

AISD argues that it substantively complied with the IDEA, and therefore, that any delay in evaluation was merely procedural.  (Dkt. # 18 at 6.) Indeed, the "IDEA does not penalize school districts for not timely evaluating students who do not *need* special education."  D.G. v. Flour Bluff Ind. Sch. Dist., 481 Fed. App'x 887, 893 (5th Cir. 2012).  However, because the Court has found *supra* that the SEHO did not err in finding that AISD should have found S.T. eligible under the IDEA, the Court proceeds to its consideration of potential procedural violations.

1.  Whether AISD had Reason to Suspect S.T.'s Disability

Sarah J. formally requested testing for special education for S.T. on March 9, 2022.  (A.R. 1186.)  Neither party appears to argue now—as they did not at the due process hearing—that AISD had notice sufficient to trigger a Child Find obligation sooner than that date.  (See Dkt. ## 18, 22.)  Indeed, the SEHO used March 9, 2022, as the date as of which both parties agreed the District had notice of S.T.'s likely disability.  (A.R. 20.)  Thus, finding no dispute on this issue, the Court similarly finds that AISD did have reason to suspect S.T.'s disability and adopts March 9, 2022, as the date of AISD's notice.

2.  Whether AISD Evaluated S.T. Within a Reasonable Time

"A finding of a child find violation turns on three inquiries: (1) the date the child find requirement [was] triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates."  Spring Branch Ind. Sch. Dist. v. O.W. by Hannah W., 961 F.3d 781, 793 (5th Cir. 2020).  There is no set length of time that is deemed reasonable or unreasonable for evaluation; rather, courts look to the steps the school took during that period to determine reasonableness.  Id.; see also D.C. v. Klein Ind. Sch. Dist., 860 F. App'x 894, 900 (5th Cir. 2021) ("When considering whether a school district acted within a reasonable time, we 'employ a case-by-case approach' and consider only 'the information and resources possessed

24

by the district at a given point in time.'" (quoting Ridley Sch. Dist. v. M.R., 680

F.3d 260, 272 (3d Cir. 2012))).  In O.W. by Hannah W., the Fifth Circuit

explained:

> [T]he reasonableness of a delay is not defined by its length but by the steps taken by the district during the relevant period. A delay is reasonable when, throughout the period between notice and referral, a district takes proactive steps to comply with its child find duty to identify, locate, and evaluate students with disabilities.  Conversely, a time period is unreasonable when the district fails to take proactive steps throughout the period or ceases to take such steps.

Id.  Further, a school district in Texas must complete its evaluation report within

45 school days of receiving parental consent.  19 Tex. Admin. Code §

89.1011(d)(1).

Here, the District argues that it timely evaluated S.T. after receiving

consent from Sarah J., which she provided on August 7, 2022.  While this is

accurate, since AISD completed the FIIE on September 26, 2022, within 45 days

of August 7, 2022, AISD admits that "the record does not explain the delay in

seeking consent after Sarah J.'s March 9, 2022 request[.]"  (Dkt. # 18 at 7.)

Indeed, the Court was unable to find any explanation in the administrative record

or in the District's briefs for why AISD did not seek Sarah J.'s consent until

August 4, 2022—nearly five months after the District received her request for

special education testing.  One District representative testified that the District is

required to provide the parent the opportunity to give consent within 15 days of

25

their request for evaluation.  See A.R. 1803; see also 19 Tex. Admin. Code § 89.1011(b)(1)–(2).

For the foregoing reasons, and because AISD has not pointed to any evidence that would suggest such a delay was mitigated by steps taken by the school between March 9, 2022, and August 4, 2022, to comply with its child find duty, the Court finds that AISD violated the IDEA in failing to timely evaluate S.T. following Sarah J.'s request in violation of its Child Find obligations.  The Court thus denies the District's motion for summary judgment and grants the Plaintiff's motion on the issue of IDEA procedural violations.

II.     Attorney's Fees/Plaintiff's Cross-Motion for Summary Judgment

In her Cross-Motion for Summary Judgment, Plaintiff Sarah J. requests attorney's fees and expenses for her success before the SEHO.  (Dkt. # 22.)  The District counters that even if the Court denies its summary judgment motion, Plaintiff's attorney's fee request should be denied as unreasonable, or at least reduced substantially due to Plaintiff's limited success at the administrative hearing.  (Dkt. # 24 at 12.)

In response, Plaintiff argues that S.T. clearly qualifies as a "prevailing party" because the legal relationship between AISD and S.T. was altered by the SEHO's decision, citing several factors that are particularly significant in weighing

26

against a fee reduction.[15]  (Dkt. # 27 at 10.)  The above arguments are reiterated in AISD's motion for summary judgment, S.T.'s reply to that motion, and AISD's reply.  (Dkt. ## 18, 23, 25.)  Accordingly, the Court considers arguments made in both parties' motions in deciding the attorney's fees issue.

Attorney's fees are authorized under the IDEA.  It provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs … to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i).  Thus, before reaching the question of reasonable fees, this Court must consider if Defendant is a prevailing party.

A.    Prevailing Party

In the Fifth Circuit "a prevailing party is one that attains a remedy that both (1) alters the legal relationship between the school district and the handicapped child and (2) fosters the purposes of the IDEA."  Parker ex rel. Krawietz v. Galveston Indep. Sch. Dist., 900 F.3d 673, 677 (5th Cir. 2018) (quoting Jason D.W. v. Hous. Indep. Sch. Dist., 158 F.3d 205, 209 (5th Cir.

---

[15] Plaintiff suggests that eight factors are particularly significant here: (1) time involved; (2) the novelty and difficulty of the legal question; (3) the requisite skill to perform the legal service properly; (5) the customary fee for similar work in the community; (8) the amount involved and the results obtained; (9) experience, reputation, and ability of the attorneys; (10) "undesirability" of the case; and (12) awards in similar cases.  (Dkt. # 22 at 6.)

1998)).  The Court will look at each of these three points: remedy, altering the legal relationship, and the purposes of IDEA.

Remedy has a broad meaning in the Fifth Circuit. "[A] litigant does not need to obtain the same relief [he] requested at the outset of the proceeding in order to qualify as a 'prevailing party' under IDEA.  Rather, [he] need only obtain a remedy 'which achieves some of the benefit [she] sought in bringing [the claim].'" Id. at 678 (quoting Alief Indep. Sch. Dist. v. C.C. ex rel. Kenneth C., 713 F.3d 268, 270 (5th Cir. 2013)).  However, "the relief obtained must be 'a judgment on the merits, a consent decree, or some similar form of judicially sanctioned relief.'" Alief Indep. Sch. Dist., 713 F.3d at 270 (quoting El Paso Indep. Sch. Dist. v. Richard R., 591 F.3d 417, 422 (5th Cir. 2009)).

Next, for a remedy to qualify an individual as a prevailing party, the remedy must alter the school district and child's legal relationship.  Id. at 677. "[E]nforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 605 (2001) (quoting Tx. State Tchrs. Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792–93 (1989)).  Implicit in that standard is that the remedy carry a "judicial imprimatur." Tracey K. ex rel. Lauren C. v. Lewisville Indep. Sch. Dist., 904 F.3d 363, 374 (5th Cir. 2018) (quoting

28

Richard R., 591 F.3d at 422 n.4).  "Judicial" is not limited to courts—it can refer to orders from administrative hearing officers as well.  Id.  However, a defendant's change in conduct that is voluntary, i.e., not mandated by a court order "although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit," consequently does not qualify as a material change.  Buckhannon Bd. & Care Home, 532 U.S. at 605.

Finally, "[t]o determine whether particular forms of relief foster the purposes of [IDEA], the critical question is whether a handicapped child receives any appropriate special services necessary to education that the child had not requested prior to the request for a due process hearing."  Tracey K., 904 F.3d at 376 (quoting Angela L. v. Pasadena Indep. Sch. Dist., 918 F.2d 1188, 1195 (5th Cir. 1990)).

Here, the SEHO's decision that S.T. was incorrectly denied eligibility under the IDEA constitutes a remedy.  As a result of that decision, the District was ordered to hold an ARD Committee meeting to prepare an IEP for S.T. and to reimburse $1,960 in private tutoring expenses from the 2021–2022 school year. A.R. 29.  The Court finds that particularly as it relates to the SEHO's eligibility decision, which this Court has agreed with above, this decision constitutes a material alteration in S.T.'s relationship with the District as it requires affirmative conduct from AISD.  As noted, in the Fifth Circuit, "[i]t is settled that 'an

administrative hearing officer's order provides the requisite "judicial imprimatur" for a party to be considered a "prevailing party" for attorneys' fee purposes[.]'" Tracey K., 904 F.3d at 374 (quoting El Paso Ind. Sch. Dist. v. Richard R., 591 F.3d 286, 292 (5th Cir. 2009)).  The eligibility decision also effected a change to S.T.'s education plan and thus, the last element is met as well because S.T. received special services to his education that he did not have prior to the request for due process hearing—i.e., the development of an IEP.  Because each of the three elements are met, the Court concludes that Defendant is entitled to attorney's fees.

B.    Reasonable Attorney's Fees

The Court must now determine what fees are reasonable.  "The calculation of attorneys' fees involves a well-established process.  First, the court calculates a 'lodestar' fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers." Douglas W. ex rel. Jason D.W. v. Hous. Indep. Sch. Dist., 158 F.3d 205, 208-09 (5th Cir. 1998).  "The court then considers whether the lodestar figure should be adjusted; in making such an adjustment, the court looks to the twelve factors established in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974)[.]" Id.  The twelve Johnson factors include: "(1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other

30

employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." Douglas W., 158 F.3d 205, 209.

"[T]he lodestar method yields a fee that is presumptively sufficient" for reasonable fees, and that "presumption is a 'strong' one." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010). This is because many of the Johnson factors are usually "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 434 n.9 (1983). Because of that likely inclusion, "[t]he lodestar may not be adjusted due to a Johnson factor that was already taken into account during the initial calculation of the lodestar." Black v. SettlePou, P.C., 732 F.3d 492, 502 (5th Cir. 2013). Even so, "some Johnson factors deserve more weight than others." Hensley, 461 at 434. In particular, the Supreme Court has held that "the most critical factor is the degree of success obtained." Id. at 436. This factor is particularly important where a litigant is deemed a "prevailing party" but does not succeed on all of his claims. Id. at 434.

When adjusting a prevailing party's fee award based on the degree of

31

his success, a court need not proportionately adjust the award based on the ratio of the relief that party requested as compared to the relief ultimately obtained. City of Riverside v. Rivera, 477 U.S. 561, 578 (1986) ("A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts."). "Nevertheless, proportionality remains 'an appropriate consideration in the typical case.'" Combs v. City of Huntington, Texas, 829 F.3d 388, 396 (5th Cir. 2016) (quoting Hernandez v. Hill Country Telephone Cooperative Inc., 849 F.2d 139, 144 (5th Cir. 1988)). Additionally, even if a party is deemed to be "prevailing," this does not mean he is entitled to recover the full amount spent on legal representation. Douglas W., 158 F.3d at 209.

As discussed above, S.T. was a prevailing party. However, there is no real dispute that he was only partially successful in the relief obtained compared to the relief requested. Although the SEHO ordered the school district to (1) find S.T. eligible under the IDEA as a child with a disability because of his CFS, (2) reimburse costs for tutoring during the 2021–2022 school year, and (3) develop an IEP, the SEHO did not grant S.T.'s remaining requests for (1) an order finding S.T. eligible as a child with a disability under the IDEA due to his dysgraphia, (2) reimbursement of private tutoring for the 2022–2023 and 2023–2024 school years, (3) a new math teacher, (4) additional compensatory services for missed

32

educational opportunities, (5) expedited assistive technology and occupational therapy evaluations, (6) additional staff training, (7) ARD committee member training, and (8) a private college consultant specializing in assisting children with special needs.  A.R. 5–6, 28–29.  Thus, Plaintiff prevailed on only a portion of the relief requested.  For this reason, the District asks that Plaintiff's attorney's fee award be significantly reduced.

Further, the District asserts several of the billed hours listed by Attorney Muñiz should not have been included.  Accordingly, the Court begins with the number of hours that should be used in the lodestar calculation before turning to the issue of whether the Johnson factors warrant a reduction in the overall fee award.

### 1.    Reasonable Number of Hours Expended

In addition to challenging Plaintiff's limited success before the SEHO, the District also makes several specific challenges to the documented attorney's fees that Plaintiff provides.  First, AISD contends that Attorney Muñiz should not be reimbursed for hours of work performed before AISD's child find duty was triggered on March 9, 2022, and for work that only related to Section 504 accommodations and meetings and homebound services—not to the IDEA proceedings.  (Dkt. # 24 at 13–14.)  AISD next argues that the hours sought for complaint drafting are unreasonable.  (Id. at 14.)  Ms. Muñiz seeks 28.4 hours for

33

drafting the First Amended Complaint and 20.7 hours for the Second Amended Complaint, totaling 49.1 hours.[16]  (Dkt. # 22-4.)

Ms. Muñiz does not respond directly to either of AISD's arguments on the reasonableness of her number of hours, rather relying on her motion for support.  (Dkt. # 27 at 10.)  Thus, the Court considers the motion, the District's arguments, and the full record in reaching its decision on the reasonableness of the hours.

The Court agrees with AISD that it should not be responsible for attorney's fees for services rendered before AISD's child find obligations arose. As discussed *supra*, there appears to be no dispute that these obligations began when Sarah J. requested an evaluation for special education services on March 9, 2022.  A.R. 1186.  Thus, the Court reduces the reasonable number of hours by two hours—the number of hours charged before March 9, 2022.  (Dkt. # 22-4 at 1.)

---

[16] The Court has verified these numbers using the billing sheets Ms. Muñiz provided.  In drafting the First Amended Complaint, Ms. Muñiz records separate entries for 3.7 hours on July 15, 2022, 4.2 hours on July 17, 2022, 3.2 hours on July 17, 2022, 8.4 hours on July 17, 2022, 3.5 hours on July 18, 2022, and 5.4 hours on July 18, 2022.  (Dkt. # 22-4 at 3.)  For drafting the Second Amended Complaint, the hours include 3.3 hours on October 2, 2023, 2.6 hours on October 5, 2023, 3.2 hours on October 7, 2023, 3.6 hours on October 8, 2023, and 5.9 hours on October 9, 2023.  However, several of the entries also included "updat[ing] research on child find and CFS" and "additional research" in addition to complaint drafting.  (Dkt. # 22-4 at 14–15.)

AISD continues to request a reduction by 5.5 additional hours for services not related to IDEA claims.  (Dkt. # 24 at 13–14.)  The District says that entries for March 9 and 10, 2022 concern a Section 504 meeting, but do not relate to any IDEA action; the May 6, 2022 through June 7, 2022 entries concern 2.7 hours of work unrelated to IDEA claims; the June 16, 2022 entry is for correspondence regarding compensatory hours for activity that predates AISD's child find obligations; and the June 20, 2023, and March 20, 21, and 28, 2024 entries were only about Section 504 and homebound services—not the IDEA claims.  (Id.)  Without a response justifying the inclusion of these hours and finding the record does not independently justify the entries' inclusion, the Court finds it proper to exclude 5.5 additional hours in the calculation of reasonable attorney's fees for the IDEA hearing.

Finally, AISD urges the Court to reduce as duplicative the hours spent drafting successive pleadings.  The District argues that 28.4 hours for drafting the First Amended Complaint and 20.7 hours for the Second Amended Complaint is unreasonable because of the incremental nature of the amendments.  (Dkt. # 24 at 14.)  However, upon reviewing the administrative record and the pleadings at issue, the Court disagrees.  The First Amended Complaint was approximately forty-seven pages in length, alleging ten violations of law.  (AR 65–112.)  While it was a successive pleading with substantial overlap in content, the Second

Amended Complaint also contained significant additions. The Second Amended Complaint alleged twenty-four violations of law and totaled sixty-seven pages in length, adding twenty pages from the First Amended Complaint. (AR 223–90.) In comparing the pleadings, the Court finds that Plaintiff has carried his burden of showing that the hours were reasonable given the amendments made, and thus the Court declines to reduce the reasonable attorney's fees on this basis.

Upon reviewing the billing sheet, the Court finds the remaining hours to be reasonable. Accordingly, Ms. Muñiz's hours are reduced for the reasons above from 206.1 to 198.6 hours.

2.      Limited Success and a Reasonable Fee

As discussed, Plaintiff qualifies as a prevailing party. After reducing the reasonable number of hours expended as described above to 198.6 hours, Plaintiff's lodestar amount for attorney Yvonnila Muñiz is $69,510. (See Dkt. # 22-4.) The lodestar is based on an hourly rate of $350 per hour for 198.6 hours of work. (Id.)

The District does not challenge the hourly rate.[17] (Dkt. # 41.) Instead, the District encourages the Court to find that Defendant achieved only

---

[17] Upon its own review, the Court finds that the rates are appropriate and accepts them for the lodestar calculation. See Tollet v. City of Kemah, 285 F.3d 357, 368 (5th Cir. 2002); (see also Dkt. # 22-3, describing the expert report of Dorene Philpot on reasonableness of rate)).

limited success and that the attorney's fees in this case should be reduced on that basis. (Id.) AISD does not suggest a percentage of the fee that would be appropriate given Plaintiff's limited success but does say that a "substantial downward adjustment" is warranted. (Dkt. # 24 at 15.)

In Plaintiff's response to AISD's Motion for Summary Judgment, he notes that although Plaintiff only succeeded on some of the nineteen issues raised, most of the issues related to AISD's denial of a FAPE to S.T. and S.T.'s eligibility as a child with a disability under the IDEA. (Dkt. # 23 at 12.) Plaintiff argues that because the SEHO ultimately concluded that S.T. was denied a FAPE, that he was eligible under the IDEA, and that he was entitled to reimbursement for some of the private tutoring, he qualifies for prevailing party status and no reduction of attorney's fees is necessary or warranted here. (Id.)

Plaintiff has submitted an expert report regarding attorney's fees in this case. Plaintiff's expert, Dorene J. Philpot, opines that Plaintiff's counsel should receive the full amount of fees requested because S.T. was the prevailing party in this case and without the SEHO's decision, S.T. would not have received "critically necessary services and benefits" and a determination that Austin ISD violated S.T.'s right to a FAPE. (Dkt. # 22-3 at 8.)

In determining whether and what amount of fee reduction is warranted, the Court will now consider each of the Johnson factors.

First, the time and labor required—under this factor, "[t]he trial judge should weight the hours claimed against his or her own knowledge, experience, and expertise of the time required to complete similar activities. If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized." Johnson, 488 F.2d at 717, abrogated on other grounds by Blanchard v. Bergeron, 489 U.S. 87 (1989). Upon review, much of the time billed by Defendant's attorney's relates to preparation for hearings, hearings themselves, and communication with clients. (Dkt. # 22-4.) All of these are activities the Court is very familiar with. Given that Ms. Muñiz is the sole attorney seeking fees in this matter, these entries do not stand out as excessive. Thus, this factor is neutral.

Next, regarding the novelty and difficulty of the questions presented, this factor provides an incentive for attorneys to take "[c]ases of first impression" by not penalizing them because they "generally require more time and effort on the attorney's part." Johnson, 488 F.2d at 718. The IDEA is certainly not a new topic. Neither party purports to argue that the matters raised in this case are a matter of first impression. However, it does appear to this Court that there is nuance in the IDEA eligibility question presented by this case, as it appears to involve questions of law not fully settled in this Circuit. Accordingly, this factor weighs slightly against a fee reduction.

38

Under the "skill requisite to perform the legal service properly," a court must "closely observe the attorney's work product, his [or her] preparation, and general ability . . . . [t]he trial judge's expertise gained from past experience as a lawyer and his observation from the bench" are the basis for this determination. Id. Here, the Court finds the briefing and representation are in line with the expectations of counsel in the Western District of Texas. The Court thus finds this factor neutral.

The next factor, the preclusion of employment "involves the dual consideration of otherwise available business . . . foreclosed because of conflicts of interest which occur from the representation" and time constraints imposed by the representation. Id. Here, neither party raises any conflicts of interest. On the issue of time commitment, IDEA cases involve a significant amount of time; the Court finds this to be the case here, where Sarah J. retained counsel over the course of several years while in administrative proceedings. This factor is thus neutral or weighs slightly in favor of no fee reduction.

The customary fee charged was already incorporated into the lodestar analysis, and neither party has provided any evidence related to a fixed or contingent fee structure, so these factors are irrelevant for this analysis.

Regarding the seventh factor, time limitations, this factor reflects that

39

"[p]riority work that delays the lawyer's other legal work is entitled to some premium. This factor is particularly important when a new counsel is called in to prosecute the appeal or handle other matters at a late stage in the proceedings." Id. This factor is neutral as here, where Sarah J. retained counsel for the IDEA proceedings shortly after requesting a due process hearing. (A.R. 38.) This factor is, thus, neutral.

The next factor—the amount involved and the results obtained is the most critical of all the Johnson factors. Douglas W., 158 F.2d at 209. Generally, courts will reduce the attorney's fees award when a plaintiff succeeds on some, but not all of its claims. See D.C. v. Klein Ind. Sch. Dist., No. 4:19-cv-21, 2020 WL 2832968, *13 (S.D. Tex. May 30, 2020) (reducing fees by 25 percent for spending time on claims that were time-barred or ultimately unsuccessful); S.F. v. McKinney Ind. Sch. Dist., No. 4:10-cv-323, 2013 WL 775529, *5 (E.D. Tex. Feb. 28, 2013) (reducing fees by 31 percent for succeeding on the gravamen of the complaint but failing on a vast majority of other claims). For instance, in Douglas W., the Fifth Circuit affirmed a lodestar reduction of 75 percent when the student "prevailed on only three of nineteen issues and . . . lost on an issue on which the parties spent more than half of the time at the hearing." Douglas W., 158 F.3d at 211. In another case, the Fifth Circuit affirmed a 60 percent reduction when the plaintiff received a damages award that was 95 percent less than what she

requested in her disclosures.  Gurule v. Land Guardian, Inc., 912 F.3d 252, 258 (5th Cir. 2018).

Still, as mentioned, the Fifth Circuit "ha[s] consistently emphasized that 'there is no per se requirement of proportionality in an award of attorney fees.'"  Gurule, 912 F.3d at 259 (quoting Combs v. City of Huntington, 829 F.3d 388, 396 (5th Cir. 2016)).  Instead, the question is whether "the relief, however significant, is limited in comparison to the scope of the litigation" on which the attorney expended its time.  Combs, 829 F.3d at 394.

The Court agrees with AISD that since S.T. was only partially successful in his claims, the attorney's fees should be reduced accordingly—the only issue is by how much.  Again, the most critical factor in determining the reasonableness of the fee award is the degree of success obtained.  Farrar, 506 U.S. at 114.  For purposes of this analysis, the Court will compare the final results after the administrative hearing with the status quo before the hearing as it has done supra.

The SEHO characterized the "main issue in this case" as S.T.'s "eligibility under the IDEA," and this Court tends to agree that although Sarah J. raised nineteen issues, this was the predominant question underlying the remaining issues.  (A.R. 1.)  On this question, the SEHO found in favor of S.T., finding eligibility under the IDEA for S.T.'s CFS, but not for his dysgraphia.  (Id.)  Sarah

41

J. initially requested nine distinct items of relief, [18] seeking (1) an order finding

S.T. eligible under the IDEA due to his CFS and dysgraphia, (2) development of an

IEP, (3) reimbursement of private tutoring for the 2021–2022, 2022–2023 and

2023–2024 school years, (4) a separate homebound teacher for instruction in math

at the level S.T.'s courses required, (5) additional compensatory services in areas

of academic concern, (6) expedited assistive technology and occupational therapy

evaluations, (7) training for staff who worked with S.T. on his disabilities, (8)

additional training for those involved on the ARD committee process and Section

504 meetings, and (9) payment for a private college consultant specializing in

assisting children with special needs.  A.R. 5–6.  The SEHO ultimately ordered

AISD to find S.T. eligible under the IDEA as a child with a disability because of

his CFS, but not because of his dysgraphia; to reimburse certain tutoring costs

during the 2021–2022 school year, but not for the 2022–2023 and 2023–2024

school years; and to develop and IEP because of the eligibility determination under

the IDEA.  A.R. 28–29.  Although Sarah J.'s success in the eligibility

determination was significant, the record does not reflect that the SEHO's decision

constituted an overwhelming success such that a downward adjustment is not

---

[18] The Court acknowledges there were officially ten items of relief listed; however, because the tenth item was a catchall item for all other relief deemed appropriate, it is excluded from this section of the analysis.

warranted given the relief on which Plaintiff's attorney was unsuccessful. Therefore, this factor weighs in favor of a fee reduction.

The experience, reputation, and ability of the attorneys, much like the customary fee charged, has previously been incorporated into the lodestar determination, so the Court finds it irrelevant for this analysis. The undesirability of the case is also likely inapplicable to this matter—the Fifth Circuit has stated that this factor relates to "[c]ivil rights attorneys" who may "face hardships in their communities because of their desire to help the civil rights litigant." Johnson, 488 F.2d at 719. For instance, IDEA litigants generally seek to defend the rights of themselves or their children, but the parties in this case have not provided evidence of any stigma in so doing the same as an attorney challenging segregationist or discriminatory policies.

Regarding the nature and length of the professional relationship with the client, a review of the record and Ms. Muñiz's billing statements suggests that Ms. Muñiz has represented S.T. continuously for several years. (A.R. 38.) Neither party makes arguments as to whether the nature and length of this relationship should impact the lodestar calculation, and thus the Court finds this factor neutral.

The Court will last consider the fee amounts awarded in similar cases. The Court has considered relevant cases and finds that those cases support an award reduction to the lodestar amount in this case. See, e.g., Northeast Ind. Sch.

43

Dist. v. I.M., 2024 WL 6909986 (W.D. Tex. Jul. 15, 2024) (reducing fees by 50

percent); Dall. Indep. Sch. Dist. v. Woody, 2018 WL 6304401 (N.D. Tex. Nov. 30,

2018) (reducing fees by 50 percent); S.F. v. McKinney Indep. Sch. Dist., 2013 WL

775529 (E.D. Tex. Feb. 28, 2013) (reducing fees by 50 percent).

Upon careful balance of the Johnson factors, especially the success

factor,[19] the Court finds a fee reduction of the total lodestar amount of $69,510 is

warranted.

C.   Conclusion

In deciding on the appropriate award of fees, the Court notes there is

no set formula to assist it in coming to a final number.  Nonetheless, it must

ultimately decide on one.  Based on the Court's familiarity with the administrative

---

[19] The Fifth Circuit has regularly emphasized, agreeing with the Supreme Court, that this factor should carry a greater weight among the other eleven Johnson factors for district courts.  See Farrar v. Hobby, 506 U.S. 103, 114 (1992) ("Indeed, 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"); Coleman v. Hous. Indep. Sch. Dist., 202 F.3d 264, *10 (5th Cir. 1999) (unpublished) ("The most critical Johnson factor is the degree of success obtained."); Singer v. City of Waco, 324 F.3d 813, 829 (5th Cir. 2003); Saizan v. Delta Concrete Prods. Co, Inc., 448 F.3d 795, 799 (5th Cir. 2006); Abner v. Kansas City S. Ry. Co., 541 F.3d 372, 376-77 (5th Cir. 2008); Roussell v. Brinker Intern., Inc., 441 F. App'x 222, 233 (5th Cir. 2011); Norsworthy v. Nguyen Consulting & Servs., Inc., 575 F. App'x 247, 249 (5th Cir. 2014); Gurule, 912 F.3d at 261 ("Courts have long understood that the 'most critical factor' in a reasonable fee is a prevailing party's 'degree of success.'"); Rodney v. Elliott Sec. Sols., L.L.C., 853 F. App'x 922, 925 n.3 (5th Cir. 2021) ("And it is certainly true that among the Johnson factors, we have suggested that 'the most critical factor in determining an attorney's fee award is the degree of success obtained.'").

record and the record of litigation in this Court, including the results, the Court's

best estimate of a reasonable fee award is 50 percent of the total claimed. That

estimate leads to a total fee award of $34,755 for Attorney Muñiz. Attorney Muñiz

also seeks additional costs of $501.55 which are not contested by the District.

Finding these costs to be reasonable, the Court grants this request and awards Ms.

Muñiz a total of $35,256.55. The Court will thus grant in part and deny in part

both the District's motion and Defendant's motion regarding the issue of attorney's

fees in this case.

## CONCLUSION

Based on the foregoing, the Court: (1) **GRANTS IN PART** and

**DENIES IN PART** the District's Motion for Summary Judgment (Dkt. # 18);

(2) **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Summary

Judgment (Dkt. # 22). Defendant is entitled to attorney's fees and costs in the

amount of $35,256.55. The Clerk's Office is **INSTRUCTED** to **ENTER**

**JUDGMENT** and **CLOSE THE CASE**.

**IT IS SO ORDERED**.
**DATED**: Austin, Texas, March 26, 2026.

_____
David A. Ezra
Senior United States District Judge

45